Barber vs. Irwin, etc.

---

THOMAS BARBER, plaintiff in error, vs. WM. A. IRWIN, defendant in error.

E. T. JONES, plaintiff in error, vs. NATHANIEL F. MERCER, defendant in error.

E. T. JONES, plaintiff in error, vs. ISAAC B. BRINSON, defendant in error.

ISAAC DENNIS and others, plaintiff in error, vs. WILLIS B. SCOTT, defendant in error.

E. T. Jones, plaintiff in error, vs. Wm. Warren, defendant in error.

[1.] The judgment of this Court, in the case of Jeffers vs. Fair, Milledgeville Term, November, 1862, considered, and the constitutionality of the enrolling acts of the Confederate Congress re-affirmed.
[2.] Persons exempted from service under the 4th specification, in the 10th section of the act of the Confederate Congress, approved 17th February, 1864, entitled, "An Act to organize forces to serve during the war," are liable to service in the militia, upon the call of the Governor of Georgia.

Decisions on *Habeas Corpus*, by Judges Hook, Richard H. Clark, and Lochrane. At Chambers. July, September, and October, 1864.

These five cases involved the same legal principles, and were argued together in the Supreme Court. They arose upon writs of *Habeas Corpus*, sued out by persons held for militia duty, against the officers having them in custody. The question was as to the liability of the relators to militia service. Their claim to exemption rested upon the ground that they were persons embraced within the act of Congress of February 17th, 1864, entitled, " An Act to organize forces to serve during the war; " and that, in terms of that act, they had been, some of them, exempted, and others detailed by the Government of the Confederate States, for agricultural purposes, which exemptions and details were for the term of twelve months, and not yet expired.

In every case, the evidence adduced at the hearing established fully the matters of *fact* alleged ; and the matter of *law* was decided by Judges Hook and Lochrane against the relators, and by Judge Clark in their favor. The cases determined by the first two were brought here by the relators; those decided by the last were brought up by the militia officers.

A particular statement of the facts of each case is now presented severally :

The case of *Barber vs. Irwin* was as follows: The relator, Barber, was within 18 and 45 years of age, and on the 6th of August, 1864, was exempted from Confederate service by

the Confederate States District Court for the Southern District of Georgia, upon filing his bond according to the act of Congress above mentioned.  Being arrested by Colonel Irwin, under and by virtue of a proclamation of His Excellency, the Governor, requiring all exempts and detailed men from the Confederate service to be sent forward to the front at Atlanta, he sued out a writ of *Habeas Corpus* on the 1st of September, 1864, for his discharge.  At the hearing, Judge Hook refused to discharge him.

The case of *Jones vs. Mercer* was as follows : The relator, Mercer, was the overseer on the plantation in Dougherty county, of Col. M. Hill, of North Carolina, and had been for several years past.  There being on the plantation over fifteen able bodied male hands, his employer applied to the proper authority, and procured his exemption as an overseer for twelve months, (not yet expired) under the act of Congress above referred to.  He was thus exempted as a bonded overseer, and had delivered, during the year, a considerable quantity of produce to the Commissary.  He was still the overseer on the plantation, and was in all respects complying with the bond.  It appeared that he was a member of Company I, 10th Regiment Georgia militia ; that the regiment was in the military service of the State ; that he had not been in service in Atlanta, but had reported at Macon ; that he was absent from his command on a furlough, which had expired, and that for this reason Lieut. Colonel Jones, acting under special orders from His Excellency, the Governor, had him under arrest.  To free himself from that arrest, he applied for and obtained a writ of *Habeas Corpus*, which Judge Clark, at the hearing, adjudicated in his favor, and discharged him.

The case of *Jones vs. Brinson* was as follows : Brinson, the relator, being between 18 and 45 years of age, and an enrolled conscript, was, in March, 1864, at the instance of Matthew Brinson's executors, and under the same act of Congress, exempted for twelve months, as an overseer upon the plantation of their testator's minor children.  The five hundred dollars had been paid, and the relator, during the

year, except when absent in the summer with the militia at Atlanta, had been superintending the plantation, and was still so engaged. Like the relator in the preceding case, he was a member of Company I, 10th Regiment Georgia militia, and was absent on an expired furlough. Upon his arrest for that cause, by Lieut. Colonel Jones, acting under special orders from the Governor, he sued out a writ of *Habeas Corpus* before Judge Clark, who, on the return of the writ, ordered his discharge.

The case of *Jones vs. Warren* was as follows: The relator, Warren, was a conscript between 18 and 45 years of age, and had been exempted for twelve months, (not yet expired) under the act of Congress, as the overseer of Mrs. A. Jones, a *feme sole*, and of Wm. M Jones, a soldier in service. The five hundred dollars had been paid, agreeably to the act. His Honor, Judge Clark, upon these facts, held him exempt from militia duty, and ordered his discharge.

Finally, the case of *Dennis and others vs. Scott* was as follows: Dennis and his co-relators had all been enrolled in the military service of the Confederate States: eight of them had been exempted for twelve months, "for agricultural purposes," and two of them detailed. The period of their exemptions and details had not expired. Captain Scott, in aiding, under orders, to organize the militia of Crawford county according to the proclamation of His Excellency, the Governor, assumed control over these parties as persons liable to militia service. They, alleging that they were not liable, applied to Judge Lochrane for writs of *Habeas Corpus*, which were issued on the 25th of July, 1864, and at the return of the same, His Honor held the relators subject to the service demanded, and restored them to the custody of the officer.

Poe and Hall, for the relators.

Branham, Toombs, and Linton Stephens, for the militia officers.

Barber vs. Irwin, etc.

*By the Court.*—JENKINS, J. delivering the opinion.

The subject for consideration in these cases, is the liability to service in the militia of Georgia, under laws of the State, of men who had, by the Confederate authorities, been exempted from service in the National Provisional army as agriculturalists, or had been detailed from it for agricultural pursuits.

Some of the Counsel who maintained their liability, based their arguments chiefly upon the unconstitutionality of those acts of the Confederate Congress providing for the compulsory enrollment of citizens as soldiers for three years, or during the war. That point we adjudicated two years since, in the case of *Jeffers vs. Fair*, but, as under the present law we are permitted to review and reverse previous decisions, we have given respectful consideration to arguments presented by gentlemen of high position and eminent ability.

We might content ourselves with the statement, that our confidence in the correctness of our ruling in *Jeffers vs. Fair*, is unshaken ; and, indeed, to avoid unnecessary repetition, we must, for the argument in chief, refer to that case, without retraction or qualification of any position therein taken. There are, however, a few points urged in the argument of this case, with great earnestness, upon which we deem it proper to comment.

I regret that neither of those gentlemen furnished to the Court a brief of his argument ; and, if, from misunderstanding at the time, or from imperfect recollection, I should fail to state their positions with fullness or accuracy, I trust the absence of this valuable aid will excuse the failure.

[1.] The Constitution makes it the duty of the Confederate States to " protect each of the States against invasion."

To do this, they must have the ability to place an adequate military force in the field. Hence, power was given to the Congress, by one clause, " *to raise armies ;* " by another, " *to provide and maintain a navy ;* " and by a third, " *to provide for calling forth the militia, to execute the laws*

*of the Confederate States, suppress insurrections, and repel invasions.*" For the purposes of the argument, the naval provision may be left out of view. The other two, which apply to land forces, must be held separate and independent grants. It cannot be successfully argued(and I believe has not been urged in this discussion) that they are only parts of one, and that armies can only be raised by calling forth the militia.

The position here assumed, which we first consider, is that armies can be raised in no way but by voluntary enlistment, and that if a larger force be at any time needed than can be thus obtained, recourse must be had to the militia, the power to call forth which is the larger grant of the two. In *Jeffers vs. Fair* we presented the view, that as to the means of executing it, the constitution does not limit the power to raise armies, and that to confine the Congress to the acceptance of volunteers would be an interpolation. From this obvious consequence of considering the clause *per se*, the learned counsel seek to escape by pressing into the service a clause of the next succeeding section, viz: the 15th, of the 9th sec. 1st Art. It is as follows: " The right of the people, to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons, or things to be seized." By no means admitting that there is any legitimate connection between the two clauses, or that the one was intended as a limitation upon the other, we proceed to show that the policy of the enrolling acts is not at all in conflict with the clause last cited. The idea is, that a man cannot be forced into the army without a seizure of his person, and that this seizure would be unreasonable—without warrant, based upon probable cause, supported by oath or affirmation—and therefore unconstitutional. It will be conceded that the well-being of society, and the daily operations of the Government, impose upon the citizen certain public

duties, which, if not performed upon requisition, must be enforced. To illustrate : Jurors, under our system, are necessary agents in the construction of Courts for the trial of causes, civil and criminal. Confederate District Courts must have jurors, and are authorized to summon them from all parts of their several districts. Jurors are thus sometimes required to leave their homes and their business, travel hundreds of miles, and remain for days or weeks. This is often grievously inconvenient, but must be endured ; because the public good requires it. If a juror, without sufficient cause, fail to obey the summons, he may be attached for contempt; i. e., his person may be seized and brought before the Court. This seizure is not regarded as *unreasonable* or unconstitutional, because it resulted from his refusal or failure to perform a public duty. But this is not the only duty incumbent upon the citizen. Publicists lay it down as a principle upon which all social organization rests, that each one owes to all of his associates the duty of defending them against external dangers. Without this, there can be neither government nor society. It is, then, an obligation older than any written constitution. Those clauses of the Confederate constitution which authorize the raising of armies and calling forth of the militia do not create : they but recognise the obligation and provide for its enforcement. The Congress, exercising one of these powers, enacts a law, that all men between certain ages, capable of bearing arms, be enrolled for service in the army for a limited time, and they are directed to report for duty at a specified time and place, just as a juror is required to report himself for a different duty. The person of neither, obeying the call, is seized ; neither is imprisoned or manacled ; the one has the freedom of the court, the other of the camp ; each one is only so far restrained as the performance of the duty enjoined requires. But if the citizen, enrolled and summoned to the camp, refuse to obey the call, shall he be allowed, thus easily, to throw off the burthen of a public duty ? If not, the only alternative, as in the case of the refractory juror, is arrest and con-

veyance to the place appointed. Such seizure is as "*reasonable*" and proper in one case as the other. They both rest upon the same principle, the obligation of public duty, and the necessity of enforcing it. The clause relied upon was intended as a security to private right ;. the argument wrests it, to giving immunity from public duty. It is no more a limitation upon the power to "raise armies" than upon that to call forth the militia. Let the two propositions be placed side by side. That of the counsel is, Congress has power to raise armies : armies are constituted of men, and the only men over whom it has any power are the citizens of the Confederate States ; but Congress can only place them in the army as volunteers—cannot force them into it, because ,another clause of the constitution declares that their persons shall be free from unreasonable service. The other proposition would read thus : Congress may call forth the militia to repel invasion, but unless they choose to come, Congress cannot force them, because elsewhere the constitution declares that the persons of the people shall be free from unreasonable seizure, and the militia are the people.

If, under the provisions of an enrolling act, any citizen be really. subject to military duty, that act puts him into the army. The general orders and regulations of the War Department, issued to carry the law into effect, appoint him a time and place of rendezvous, and assign him a position in the army. By them, as well as by the law, he must govern himself. If he set all these at defiance, he becomes subject to *military* arrest, and can no more take shelter under the clause of the constitution, relative to unreasonable seizures, than can a deserter from the army. He is subject to military law and military process. There needs no warrant from a civil magistrate, founded upon oath or affirmation, to arrest him for dereliction of military duty. If it be attempted to force one into the service, not subject by the terms of the act, he has his remedy by appealing to Courts of law. It is manifest that if the scope and operation, claimed for it, be

given to this clause, there can be neither army nor militia effective for defense of the country. We, therefore, cannot accept it as an express limitation of the general power to raise armies.

It will scarcely be questioned that an army already raised, by whatever process, would be the primary instrument of defence. If it be present at any invaded point, and adequate to repel invasion, no sane man would think of calling forth the militia. But if it chance not to be sufficiently near, or not sufficiently strong to meet a sudden or a great emergency, an appropriate occasion for bringing the militia into the field will have occurred.

But there is another reason for supposing that the framers of the constitution regarded the army of the Confederate States as the chief instrumentality whereby the strength of the nation should be exercised, and of course intended to make that grant of power large in proportion to its importance. Stern necessity sometimes compels nations, the most just and pacific in their policy, into aggressive wars. How is such a war to be prosecuted? Not by calling forth the militia, because forbidden by express limitations of that power. They may be called out to execute the laws of the Confederate States but these are not to be executed on foreign soil; to suppress insurrections, but they can exist only within our own borders; to repel invasions, but the object would then be to make, not to repel an invasion. So far as land forces are concerned, the regular army of the Confederate States would be the sole reliance in such a war.

But the opposite view, viz: that the militia were intended as the chief reliance in war, and the power to use them, the larger grant, is sought to be established inferentially. It is said, that throughout the constitution, the rights of the States and of individuals are carefully guarded against encroachments of the common agent—that the Confederate Government is hedged in on all sides with limitations—and then, we are asked, if the power over the militia be not the larger of the two in question, the main reliance, why in such

a constitution, is it carefully limited and guarded, whilst the other is given without limitation ? We confess ourselves insensible to the force of this logic. Viewing it as a question of constitutional law, we had supposed that the very limitations, so confidently put forward as evidences of its superiority, made it a lesser power than its competitor, which is unlimited as to the means of executing it, or the purposes for which it may be used. It was certainly in the discretion of the framers of the constitution to give the preponderance to *either;* and had they expressed the clauses thus: " the Congress shall have power, *first*, to raise armies by voluntary enlistment, and *secondly*, to call forth the militia," thus imposing limitations where they do not now exist, and omitting them where they do, we should have held that the second was the greater power. If asked for a reason, we should have replied, that limitations of power have a diminishing effect. The opposite theory is that they but prove its magnitude. Measured by this standard, had the Convention added to the militia clause, as it now stands, these words: " With the consent of the Executive of the State, whence they may be called," it would have been the most stupendous power in the whole catalogue, because the most thoroughly limited.

Another objection (of like nature) to our construction, is that the unlimited power to place in the army of the Confederate States all citizens capable of bearing armes, is incompatible with the sovereignty of the several States—may be so exercised as to deprive them of the ability to enforce their police, or to execute the mandates of their courts, and, therefore, cannot be supposed to have been within the intention of the framers of the constitution. The reply is, that public exigencies, and especially military exigencies, require that the Legislature be entrusted with ample powers. If the presumption, that no power susceptible of abuse could have been intended to be given, is to govern, in the construction of the constitution, the palpable result is, that our government is too weak to accomplish the ends for which it was

instituted. In the language of Gov. Troup, so understood, "it is the weakest and most contemptible Government on earth ; it is neither fit for war nor peace."

But, in the same argument, after premising, that beyond the raising of armies, by voluntary enlistment, the Congress had no recourse, save in calling out the militia, it was broadly admitted, that in this way, they might, to meet invasion, place in actual military service all men capable of bearing arms, " *even to the last man.*" Now, this done, what becomes of the sovereignty of the States, so jealously guarded, in construing the other clause? Where would be their police force ; where their Sheriff's *posse cometatus ?* Why is the presumption so vigorously wielded against one power allowed to slumber when the other is invoked ? In this connection, it was suggested, that by our construction, the power to raise armies may be exercised in times of peace as well as of war, and the consequent danger, both to the liberty of the citizen and the stability of our republican institutions, was vividly portrayed.

These are certainly very grave questions, under a government of limited powers, in this age of the world. Taking into view, at the same time, the complicated nature of international affairs, unavoidably imperiling the peace of nations, the vast armies employed in modern warfare, and the tendency to encroachment of political power in free governments, we see clearly that a proper adjustment of the latter is a problem by no means easy of solution. But it is apparent that this is an appropriate subject for consideration in the formation of such governments. Ours is of very recent origin, and its framers not without the benefit of experience. It is our happiness to believe, that in theory, at least, they have solved the problem ; and if practical efficiency be not yet fully attained, it must be sought in amendment of the fundamental law. It may be safely affirmed, that there are powers (and prominent among them is that of war) which cannot be made sufficiently ample for probable contingencies, and yet so guarded, *in the grant itself*, as to avoid

possible abuses. As we understand it, the philosophy of our system is, to make the grant large enough to meet such contingencies, and to provide against abuse, in the structure of the government. Let us illustrate: we may suppose that the sages who framed our constitution, felt their utter incompetency to estimate the extent of preparation which it would be necessary for the Confederate Government, fifty years hence, to make, in peace, for war, or the numerical force that would be required in war, or the amount of revenue necessary to prosecute it. Hence, the breadth of power conferred in regard to the raising of armies and of revenue. But did they overlook the danger of its abuse? Did they leave it without checks and safe-guards? By no means. Where are these to be found? We answer, in the structure of the government. 1. The tenure of all offices is comparatively short—of some employed in the exercise of these powers, absolutely so. 2. They are entrusted not to one man, but to many. 3. These compose not one body, but two, acting separately, yet required to concur in the passage of laws. 4. To constitute one of these bodies, each of those States, whose sovereignty, and even existence, are supposed to be endangered, appoints, through its Legislature, two of its own citizens, to serve for a limited term. 5. The other body is more numerous, consisting of representatives from each State, partaking of State pride and home influences, in common with their fellow citizens, among whom they reside, by whom they are chosen, and to whom they are bi-ennially held responsible. 6. Over the acts of these bodies, the Chief Magistrate, elected by the whole people, (not as constituting one mass, but as organized into State sovereignties,) exercises a veto power, which does not absolutely annul them, but compels their reconsideration, in the reflected light of his wisdom, and their abandonment, or re-enactment, by two-thirds of each body. 7. In a third department, the Judiciary, is reposed the power of arresting the execution of unconstitutional laws, a salutary restraint, but one which should be applied with great circumspection.

The security thus afforded is both preventive and remedial of abuses. The responsibility of the representative to his constituents, and his community of interest with them, predispose him to act with caution and fidelity, and the always recurring election is a potent corrective of his errors, whether of judgment or of purpose. Nothing is more absolutely certain than that the vast operations of government cannot be conducted without more or less of trust, of confidence.

We have said that the *theory* is good, but, *for the argument*, let us suppose that it has not been so perfected in practice as to secure popular liberty and the rights of the States, and that this discussion has developed imperfections in the system. What then? Shall the Courts undertake to remedy them by coupling together disconnected and independent clauses of the constitution, or by imposing limitations and restrictions, not found in the instrument, which they deem reasonable and proper, upon the presumption that they must, therefore, have been intended? Should the Judiciary arrogate such reforming power, we apprehend there would, ere long, be heard a general out-cry for restrictions and limitations upon that department. Rather let the system be perfected by amendment of the constitution, in the manner therein provided.

[2.] But though the enrolling acts be constitutional, it by no means follows as a necessary consequence that the relators in these cases are exempt from active service in the militia, under the recent call of the Governor of Georgia. The question remains to be considered, are they in fact in the service, military or civil, of the Confederate States? If they be really in the army, or if they be officers or agents of that Government necessary to the performance of its constitutional functions, they are not subject to militia service in the field; otherwise, they are.

The relators claim exemption from duty under the fourth specification of the tenth section of the act of February 24th, 1864, of the Congress, entitled "An act to organize forces to

serve during the war." That section provides, "That all laws granting exemptions from military service be, and the same are hereby repealed, and hereafter none shall be exempted except the following," etc. Then follow sundry specifications of exemptions. Some of these relators are clearly within the first clause of the fourth specification, and the remainder as clearly within the second clause. But from what. service does this tenth section exempt them ? From the service exacted ·by that and other preceding enrolling acts—from service in the army of the Confederate States, and from no other service. It has no reference whatever to militia duty. There is nothing in the act to indicate an intention to exempt from the latter. If such an intention had been clearly expressed, it must have failed from lack of power to grant it. In the matter of Fitzgerald and others at the last Macon term, a majority of this Court held, that there is in the Confederate constitution no delegation of power, express or implied, to grant individual citizens irrevocable exemption from military service. This proposition was there applied to service in the army of the Confederate States, and a *fortiori* is it applicable to militia service under the laws of a State. In no view, then, can the 10th section of that act avail the relators in this case. It is insisted, however, that they are within the conscript age, and *subject* to the military service of the Confederate States, and, therefore, beyond the reach of the State authorities. It may be very true, that under the 1st section of the act, considered *per se*, they are so; but we must look to the whole act and to the relation actually existing between them and the Confederate Government. The record discloses the fact, that each of them has brought himself within the scope of the 10th section, and that the Government so recognises him. The effect of that section is to exempt from the liability which would otherwise have attached under the first. Construing the act so as to give effect to both sections, (which is the imperative duty of the Court,) we are led to the conclusion, that the relators have a special exemption from a general liability;

that they are not in the army of the Confederate States, and that the performance by them of service with the State militia will in no way affect the military operations of the Confederate Government.   An attempt has been made to distinguish between those of the relators who obtained exemption under the 1st clause of the 4th specification, 10th section, (commonly called *bonded men*,) and those exempted under the 2d clause, usually denominated *detailed men*. The former, it is said, never have been in the army, and are veritable exempts ; whilst the latter have been enrolled, perhaps have been actually in the field.   The only difference, we perceive, in the status of these classes, is in the manner in which exemptions are obtained.   They are effected, in one case, by compliance with certain statutory regulations set forth in the first clause, and in the other case, by an appeal to the discretion vested in the Secretary of War, under the direction of the President, by the 2d clause. The 10th section treats only of exemptions.   In the 2d clause of the 4th specification, the language used, is " exempt or detail," and " exemptions or details," evidently employing the words as synonymous.   And in the proviso, all such are referred to under the general designation, " exemptions." The fact is indisputable, that whether denominated bonded men," or " detailed men," whether exonerated under the 1st or 2d clause, they all enjoy actual exemption from military service. None of them are in the army ; none of them are subject to the rules and articles of war.   They are all at home, attending to their ordinary pursuits.   We regard them all as exempts from the military service of the Confederate States, and equally subject to the military service exacted of them by the State of Georgia.

It is not pretended that they are civil officers, or agents of the Government.   Some of them, it is true, have entered into certain contracts with the Confederate Government, and allege that the militia service exacted of them may interfere with the performance of those contracts.   It does not appear that contracts, such as these, are necessary to ena-

ble the Confederate Government to execute any one of the high trusts confided to it by the constitution, and, therefore, they cannot come between the sovereignty of the State and her citizens, as exemptions from the highest duty they owe her—resistance to invasion. This is no contest between the two coördinate governments. The contract is set up as the citizen's plea against his own State Government, and as such, we overrule it.

The judgments below, in the cases of *Barber vs. Irwin*, and *Dennis and others vs. Scott*, are affirmed; and those in the cases of *E. T. Jones vs. Mercer*, *The Same vs. Brinson*, and *The Same vs. Warren*, are reversed.